# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PAUL LUKA,

       Plaintiff,

   v.

THE PROCTOR AND GAMBLE
COMPANY, INNOVATIVE BRANDS,
LLC, IDELLE LABS, LTD., and HELEN
OF TROY, LTD.,

       Defendant.

Civil Action No. 1:10-cv-02511
Judge Kennelly
Magistrate Judge Cole


JURY TRIAL DEMANDED

---

**DEFENDANT PROCTOR AND GAMBLE'S REPLY IN SUPPORT
OF ITS MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page(s)**

I.     INTRODUCTION ......................................................................................................1

II.    LUKA'S ARGUMENT THAT THE SALE OF SURE MAX IS IRRELEVANT
IGNORES THE LAW OF FALSE MARKING AND THE PLAIN MEANING
OF THE PTLA.............................................................................................................2

III.   LUKA'S RESPONSE TO P&G'S MOTION TO DISMISS FAILS TO PROVIDE
ANY FACTUAL BASIS TO SUPPORT AN ALLEGATION OF FRAUD
UNDER FED. R. CIV. P 9(B) ....................................................................................5

      A.    Luka's response highlights the fact that his Amended Complaint is devoid
of any factual allegations that support the requisite intent to deceive the
public..............................................................................................................5

      B.    Marking with expired patent numbers does not create a rebuttable
presumption of deceptive intent at the pleading stage ..............................8

      C.    *Blistex*, and its progeny, fail to analyze allegations of intent to deceive
under the proper standard for cases alleging fraud ................................10

IV.    35 U.S.C. § 292 VIOLATES ARTICLE II OF CONSTITUTION ...................................11

      A.    The existence of other *qui tam* statutes throughout British and American
history is not a significant factor in determining whether 35 U.S.C. § 292
violates Article II of the Constitution ....................................................11

      B.    Section 292 violates the "Take Care" clause of Article II because it gives a
private party executive power without sufficient control by the executive
branch...........................................................................................................14

           1.    Section 292 does not give the executive branch "Sufficient
Control" over a private citizen's suit brought on behalf of the
United States' interests. ..........................................................14

           2.    The United States' decision not to substantively intervene fails to
save Section 292 from being unconstitutional as applied to the
facts of this case. ....................................................................17

V.    CONCLUSION.......................................................................................................19

i

# TABLE OF AUTHORITIES

*Acito v. IMCERA Group, Inc.*,
  47 F.3d 47 (2d Cir. 1995)) ...............................................................................6

*In re BP Lubricants USA Inc.*,
  No. 2010-960 (Fed. Cir. Oct. 20, 2010)............................................................5

*Baker v. ISTA Pharm., Inc.*,
  No. 2:10-cv-02273 ..............................................................................................7

*Simonian v. Blistex*,
  No. 10-cv-01201, 2010 WL 4539450 (N.D. Ill. Nov. 3, 2010) ............................10

*Brinkmeier v. Graco Children's Products Inc.*,
  No. 09-0262, 2010 WL 545896 (D. Del. Feb. 16, 2010)........................................7

*Clontech Laboratories, Inc. v. Invitrogen Corp.*,
  406 F.3d, 1347 (Fed. Cir. 2005)..........................................................................5

*Exergen Corp. v. Wal-Mart Stores Inc.*,
  575 F.3d 1312 (Fed. Cir. 2009).....................................................................5, 7, 8

*Heathcote Holdings Corp. v. Crayola LLC*,
  No. 10-cv-0342 (N.D. Ill. Dec. 10, 2010)...............................................1, 6, 7, 10

*Hollander v. Etymotic Research*,
  No. 10-526, 2010 WL 2813015 (E.D. Pa. July 14, 2010) .......................................7

*Inventorprise, Inc. v. Target Corp.*,
  No. 09-380, 2009 WL 3644076 (N.D.N.Y. Nov. 2, 2009) ......................................7

*Juniper Networks, Inc. v. Shipley*,
  No. 2010-1327 (Fed. Cir. Feb. 10, 2011)................................................................5

*Lerner v. Fleet Bank, N.A.*,
  459 F.3d 273 (2d Cir. 2006).................................................................................6

*Marbury v. Madison*,
  1 Cranch 137 (1803) ..........................................................................................12

*Morrison v. Olsen*,
  487 U.S. 654 (1988)...........................................................................................14

*U.S. v. Nixon*,
  418 US 683 (1974).............................................................................................16

*Patent Compliance Group, Inc. v. Wright Medical Technology, Inc.*,
    No. 3:10-cv-289 (N.D. Tex. Dec. 16, 2010) ............................................................7

*Pequignot v. Solo Cup Co.*,
    608 F.3d 1356 (Fed. Cir. June 10, 2010) ................................................5, 6, 8, 9

*Pequinot v. Solo Cup Co.*,
    608 F. Supp. 2d 714 (E.D. Va. 2009) .....................................................................14

*Printz v. United States*,
    521 U.S. 898 (1997)................................................................................................14

*Riley v. St. Luke's Episcopal Hospital*,
    252 F.3d 749 (5th Cir. 2001) ..................................................................12, 15, 18

*Simonian v. Blistex*,
    No. 10-cv-01201, 2010 WL 4539450 (N.D. Ill. Nov. 3, 2010) .............................10

*Stauffer v. Brooks Brothers*,
    619 F.3d 1321 (Fed. Cir. 2010).............................................................................14

*United States ex rel. Kelly v. Boeing Co.*,
    9 F.3d 743 (1993).............................................................................................15, 16

*United States ex rel. Stone v. Rockwell International Corp.*,
    265 F.3d 1157 (10th Cir. 2001) ......................................................................15, 18

*United States ex rel. Stone v. Rockwell International Corp.*,
    282 F.3d 787 (10th Cir. 2002) ..............................................................................15

*United States ex rel. Taxpayers Against Fraud v. General Electric Co.*,
    41 F.3d 1032 (6th Cir. 1994) ..........................................................................15, 16

*Vt. Agency of Natural Res. v. U.S.*,
    529 U.S. 765 (2000)................................................................................................13

*Vicom, Inc. v. Harbridge Merchant Services, Inc.*,
    20 F.3d 771 (7th Cir. 1994) ...................................................................................10

### STATUTES

31 U.S.C. §§ 3729-3733 .......................................................................................15

31 U.S.C. § 3730(b-c)...........................................................................................13

35 U.S.C. § 292(a) ...................................................................................1, 2, 3, 4, 11, 19

Act of Apr. 30, 1790, ch. 9, §§ 16, 17, 1 Stat. 116 .......................................................13

Act of May 3, 1802, ch. 48, § 4, 2 Stat. 189, 191 .........................................................13

Fed. R. Civ. P 9(b) ...........................................................................................................5

Fed. R. Civ. P. 56 .............................................................................................................2

Judiciary Act of 1789, 1 Stat. 80...................................................................................12

## MISCELLANEOUS

Note, Should the Supreme Court Presume that Congress Acts Constitutionally? The Role
of the Canon of Avoidance and Reliance on Early Legislative Practice in
Constitutional Interpretation, 116 Harv. L. Rev. 1798, 1809-12 (Apr. 2003) .........................12

## I.   INTRODUCTION

Luka attempts to avoid summary judgment by claiming that P&G "maintained significant control over the manner in which its licensee(s) marked Sure Max with the expired patent numbers."  (Plaintiff's Responsive Brief at 4) (hereafter "Resp.").  Luka's argument, however, is premised on an incorrect interpretation of the law of false marking and an incorrect interpretation of the Patent and Technology License Agreement ("PTLA").  As to the law, Section 292 only imposes liability on an entity that marks a product.  35 U.S.C. § 292(a) ("Whoever marks upon. . . .").  Luka does not dispute that P&G never marked the Sure Max product with an expired patent number.  Therefore, under a correct interpretation of the law, P&G cannot be liable for false marking.  Further, even if the law were expanded to include an entity that "maintains significant control" over another, Luka's interpretation of the PTLA is incorrect because none of the statements in the PTLA permit P&G to control Innovative Brands, LLC ("Innovative").  In fact, the PTLA explicitly states that Innovative's marking obligations (Resp. Ex. B at § 5.4) are subject to U.S. laws (*Id.* at § 5.3) and cease when the patents expire.  (*Id.* at § 3.1).  Therefore, even if the law were expanded to include Luka's "control over the actual marker" theory, Luka has still failed to establish any basis for P&G's control over Innovative.  For these reasons, P&G respectfully requests that this court grant its motion for summary judgment of no liability under 35 U.S.C. § 292.

With respect to the motion to dismiss, Luka raises two arguments.  First, Luka improperly attempts to rely upon a "rebuttable presumption" of intent to deceive to satisfy his pleading requirements.  However, marking with expired patent numbers does not create a rebuttable presumption of deceptive intent at the pleading stage where the knowledge alleged is knowledge that patents eventually expire.  Second, Luka argues that he has plead the specific "who, what, when, where, and how" facts required to allege intent to deceive under Rule 9(b), but these "facts" are insufficient and have been rejected in a number of other lawsuits, including

a recent decision in this District.[1]  Because all arguments made by Luka fail, this Court should grant P&G's Motion to Dismiss.

Finally, Luka adopts the position of the United States in response to P&G's argument that the false marking statute violated Article II of the constitution.  The United States argues that the false marking statute is constitutional because the long history of *qui tam* statutes, in general, and because the false marking statute does not prevent the United States from brining an action.  These arguments, however, miss the mark.  The false marking statute must be evaluated on its own terms, not lumped in with other statutes.  Further, the constitutional problem with false marking statute is not who brings the suit, but rather that the United States has no control over a relator once they do bring a suit.  For this reason as well, the Amended Complaint should be dismissed.[2]

## II.     LUKA'S ARGUMENT THAT THE SALE OF SURE MAX IS IRRELEVANT IGNORES THE LAW OF FALSE MARKING AND THE PLAIN MEANING OF THE PTLA

Luka cannot avoid summary judgment in this case because it has not presented any genuine issue as to any material fact.  Fed. R. Civ. P. 56.  As a legal matter, the first element of false marking is actual marking.  35 U.S.C. § 292(a) ("Whoever marks upon. . . .").  P&G stated that it did not manufacture any Sure Max product, design the Sure Max packaging, or mark any Sure Max product with an expired patent number.  [Dkt. No. 21] (Hogan Charles Decl. at ¶ 4) (also attached).  Luka has not offered any evidence to the contrary.  For this reason alone, P&G's motion for summary judgment should be granted.

Instead of challenging this undisputable fact, Luka argues that P&G can still be liable for false marking because P&G "maintained significant control over the manner in which its

---

[1]   *Heathcote v. Crayola*, No. 10-cv-0342, op. and ord. at 4-6 (N.D. Ill. Dec. 10, 2010) (J. Hart) (attached as Exhibit 1).

[2]   For the convenience of the Court, P&G has combined its reply to Luka and the United States in one brief.  A result, this joint reply is 19 pages, four pages over the limits imposed by L.R. 7.1.  As such, P&G respectfully seeks an extension of the page limits in order to avoid filing a separate, and redundant, reply to both Luka and the United States.

licensee(s) marked Sure Max with the expired patent numbers." (Resp. 4.) However, even if this were true, controlling a third party that actually marked the Sure Max product does not satisfy the first element of an allegation of false marking. The plain language of the statute does not expand the meaning of "Whoever" to any other entity. Furthermore, there is no indication in the statue, nor does Luka cite any legal precedent, for his theory that "Whoever" should be expanded to include an entity that "maintains significant control" over the entity that actually marks a product. Thus, Luka's attempt to avoid summary judgment should be rejected because only the entity that actually marks a product with an inapplicable patent number can be liable under 35 U.S.C. § 292.

Furthermore, even if this Court finds that Section 292 can be expanded to include entities that "maintain significant control" over the actual patent marker, Luka will still not be able to avoid summary judgment. The only support for Luka's conclusion that P&G controls Innovative is the Patent and Technology License Agreement ("PTLA") between P&G and Innovative. However, when considered as a whole document, the PTLA reveals that P&G did not require Innovative to mark any products with expired patents, nor does the PTLA require P&G to maintain significant control over Innovative.

First, despite Luka's mischaracterization of the PTLA as lasting "for perpetuity," (Resp. 4) (citing § 3.2),[3] the relevant license in the PTLA expired at the time the patents expired. The license relevant to this case was for "Licensor Patent Rights," which gave Innovate a fully-paid up license to the Sure Max patents. (Resp. Ex. B at § 1.7.) As a part of this agreement, Innovative was required to mark the Sure Max products. (*Id.* at § 5.4) ("Licensee shall place in a conspicuous location, on any product made or sold under the Licensor Patent Rights a patent notice. . .."). The term of this requirement, and the term of the entire Licensor Patent Rights

---

3    Luka's characterization of the agreement as perpetual refers to "Licensor Technology," which was defined as "know-how, unpublished research and development information, unpatented inventions, trade secrets, and technical data in the possession of Licensor." (Resp. Ex. B at § 1.6). The Licensor Technology term was perpetual. (Resp. Ex. B at § 3.2).

agreement, only "commence[d] on the Effective Date and continue[d] until the expiration of the last expired patent of the Licensor Patent Rights." (*Id.* at § 3.1.)  As such, P&G did not require Innovative to mark any products with expired patents.

Second, the PTLA explicitly states in several locations that Innovative is required to follow all applicable laws.  Thus, even if it was P&G's intent to require Innovative to mark with expired patents, Innovative would not have been under any legal obligation to do so.  For example, the section that required Innovative to mark the Sure Max product stated that "Licensee shall place in a conspicuous location. . . a patent notice in accordance with the applicable patent marking laws of the country in which the product is made and/or sold." (*Id.* at § 5.4.)  Furthermore, the preceding section of the PTLA included a general covenant that the "Licensee and its contract manufacturers shall comply with all applicable laws and regulations. . ." (*Id.* at § 5.3) ("Compliance with Laws.")  As such, P&G could not have even required Innovative to violate any laws, let alone mark any products with expired patents.

Third, even if Innovative was under the impression that the marking provision superseded the explicit term length of the agreement and the requirements to follow applicable laws, P&G could not have controlled Innovative to mark the products with expired patent numbers because Innovative was under no obligation to practice the Licensor Patent Rights.  (Resp. Ex. B at § 2.6) ("No Obligation to Practice.  Licensor [P&G] agrees that nothing herein obligates Licensee [Innovative] to practice the licenses granted under Sections 2.1 [Licensor Patent Rights] or 2.2 [Licensor Technology].")

Therefore, based on a complete and accurate analysis of the PTLA, P&G did not require Innovative to mark any products with expired patent numbers, nor did the PTLA give P&G the ability to control Innovative.  As such, P&G respectfully requests that this Court grant its motion for summary judgment of no liability under 35 U.S.C. § 292.  If so, the Court can end its inquiry here, as P&G's motion to dismiss will be moot its motion for summary judgment is granted.

III.     **LUKA'S RESPONSE TO P&G'S MOTION TO DISMISS FAILS TO PROVIDE ANY FACTUAL BASIS TO SUPPORT AN ALLEGATION OF FRAUD UNDER FED. R. CIV. P 9(B)**

A.     **Luka's response highlights the fact that his Amended Complaint is devoid of any factual allegations that support the requisite intent to deceive the public**

In his opposition, Luka wrongly claims to have pled the "who, what, when, where, and how" required in alleging an intent to deceive under Rule 9(b).  (Resp. 6-7.)  Luka's misapplication of the "who, what, when, where, and how" requirement converts false marking into a strict liability offense, as his generic statements might be equally applied to any company that marks products with patent numbers.  However, Section 292 does not impose strict liability.[4] Instead, it requires proof of intent to deceive the public, as stated by the Federal Circuit in *Pequignot v. Solo Cup Co.*, 608 F. 3d 1356, 1363 (Fed. Cir. June 10, 2010), and *Clontech Labs, Inc. v. Invitrogen Corp.*, 406 F.3d, 1347, 1352 (Fed. Cir. 2005).

The Federal Circuit[5] has held that an allegation of intent to deceive must be accompanied by "sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind."[6] *Exergen Corp. v. Wal-Mart Stores Inc.,* 575 F.3d 1312, 1327 (Fed. Cir. 2009) (analyzing intent under Rule 9 in the inequitable conduct context).  The standard is only satisfied if a pleading identifies the "specific who, what, when, where, and how" of the alleged intent to deceive.  *Id.* at 1328 (emphasis added).  Luka's allegations lack specificity, and could, in theory, be applied to virtually any company who has allegedly placed expired patents

---

4     Response of the United States as *Amicus Curiae* in Support of the Petitioner, *In re BP Lubricants USA Inc.*, No. 2010-960 (Fed. Cir. Oct. 20, 2010) (hereafter "*In re BP Lubricants* Amicus Brief*") [Dkt. No. 29, Ex. 1].

5     Furthermore, Chief Judge Rader recently commented during oral argument in another false marking case that Rule 9(b) applies and that it requires a complaint to include significant factual allegations.  *Juniper Networks, Inc. v. Shipley*, No. 2010-1327 (Fed. Cir. Feb. 10, 2011) ("We said in the *Stauffer* opinion that this is like fraud and follows Federal Rule of Civil Procedure 9(b) and that requires **great** particularity in your pleadings. . .") (emphasis in original) (*available at* http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2010-1327.MP3 at 1:35).

6     In Plaintiff's response, he agrees that "Rule 9(b) itself makes clear that … a plaintiff must 'state with particularity' the 'circumstances constituting fraud.'"  (Resp. 9.)

on its products by just switching out the company's name, patent(s), patent expiration date(s), and product(s).

The facts alleged in Luka's Amended Complaint are insufficient to meet its burden under Rule 9(b), namely, the "specific who, what, when, where, and how" of the alleged intent to deceive. *Exergen*, at 1328.[7] Luka relies on the following:

(1) the who is "one or more of the defendants" (Resp. 6);

(2) the what is the products "that P&G. . . allowed. . . to be marked with expired patent numbers" (Resp. 7);

(3) the when is "after the patents in question had expired" (*Id.*);

(4) the where is "on the packaging of the Sure Max product" (*Id.*);

(5) the how is "placing the expired patent numbers on the packaging" (*Id.*).

These facts lack specificity, and Luka's arguments that they are sufficient under Rule 9(b) are circular. In a false marking case, the relevant inquiry regarding intent is whether the complaint contains sufficient facts to support the allegation that Proctor and Gamble knew that its patents were inapplicable. *Solo Cup*, 608 F.3d at 1362-63. Luka's allegations are clearly devoid of any specific facts regarding "when" the purported false marking was initiated and/or continued, "where" the purported false marking occurred, or "how" P&G intended to deceive the public through is purported false marking.

Luka's purported "facts" are insufficient for the additional reason that they are not tied to an allegation of fraud. *See Heathcote Holdings Corp. v. Crayola LLC*, No. 10-cv-0342, op. p. 5 (N.D. Ill. Dec. 10, 2010) ("There are no allegations regarding who at defendants was responsible for marking the products, any procedures at defendants for checking on the continued pendency of patents, when or where the products at issue were manufactured, and when the offending products have been marketed or sold, nor is there any allegations describing any particular

---

7   *Citing Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) ("But because 'we must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations[,] . . . plaintiffs must allege facts that give rise to a strong inference of fraudulent intent.'" (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)) (alterations in original) (citations omitted).

advertising or other marketing activity."). This lack of specificity cannot satisfy Rule 9(b). A recent decision from the Western District of Tennessee is on point. *Baker v. ISTA* clarified that general allegations of intent to deceive the public are insufficient to satisfy Rule 9(b). See *Baker v. ISTA Pharm., Inc.*, No. 2:10-cv-02273, ord. at 5 (W.D. Tenn. Nov. 17, 2010).[8] "To survive a motion to dismiss, Plaintiff's complaint must allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind." *Id.* at 6 (citing *Exergen*, 575 F.3d at 1327).

The United States, in a recent amicus brief filed before the Federal Circuit, as well as several district courts have concluded that the mere knowledge of a patent's limited duration is insufficient to establish intent to deceive.[9] Here, the allegations in the Amended Complaint are no more consistent with an intent to deceive than with no intent to deceive, and Luka has not pled the required additional facts necessary to make that distinction. *Crayola*, No. 10-cv-0342, op. p. 5-6. ("While plaintiff conclusorily alleges an intent to deceive, the minimal factual support alleged is an insufficient basis for reasonably inferring an intent to deceive and establishing a plausible claim that including the expired patents was for the purpose of deceiving the public.").[10] In fact, in cases alleging false marking violations based on expired patents, as

---

[8]    A copy of *Baker v. ISTA* is attached as Exhibit 2.

[9]    *See*, *e.g.*, *Inventorprise, Inc. v. Target Corp.*, No. 09-380, 2009 WL 3644076, at *6 (N.D.N.Y. Nov. 2, 2009); *Brinkmeier v. Graco Children's Products Inc.*, No. 09-0262, 2010 WL 545896, at *5 (D. Del. Feb. 16, 2010); *Hollander v. Etymotic Research*, No. 10-526, 2010 WL 2813015, *7 (E.D. Pa. July 14, 2010); *In re BP Lubricants* Amicus Brief at 15-17 ("after all, an expired patent is just as likely to be the result of inattention as intent to deceive, and additional facts are necessary to distinguish whether the defendant acts were intentional or inadvertent").

[10]   *See Patent Compliance Group, Inc. v. Wright Medical Tech., Inc.,* No. 3:10-cv-289, mem. op, and ord. at 5 (N.D. Tex. Dec. 16, 2010) ("Every one of the facts pleaded by [relator] is evidence that [defendant] did know or should have known that some of its patents were expired, not that [defendant] intended to deceive the public by mismarking several of its products. Coupled with the fact that all of [plaintiff's] false marking claims are for previously valid, expired patents, these are the types of allegations that are 'merely consistent with' a defendant's liability, stopping short of the line between possibility and plausibility of entitlement to relief.") (citing *Iqbal*, 129 S. Ct. at 1949) (attached as Exhibit 3); *see also Graco*, 684 F. Supp. 2d at 554 (granting motion to dismiss because the complaint was only premised on the size and sophistication of the company).

7

alleged in Luka's Amended Complaint, the bar for proving intent to deceive is particularly high. *Solo Cup*, 608 F.3d at 1363. Luka's Amended Complaint has not provided facts from which this Court could infer an intent to deceive.

Luka justifies the lack of specific facts to support its conclusion that P&G knew that its patents were inapplicable by arguing that Rule 9(b) "may be alleged generally" when information regarding knowledge and intent are "uniquely within another party's control," and can be pled on "information and belief." (Resp. 9) (citing *Exergen*, 575 F.3d at 1330).[11] This attempt to avoid the particularity requirements of Rule 9(b), however, has already been rejected by the Federal Circuit. In *Exergen*, the Federal Circuit held that an allegation of intent to deceive (and the required who, what, when, where, and how) could not be based "on information and belief," unless those facts were uniquely in another party's control and the pleading provided the source of the information and the basis for believing that no other party could access that information. *Exergen*, 575 F.3d at *1330-31 n.7 (citations omitted). Luka's Amended Complaint fails to provide this information. As such, because Luka lacked the factual basis to support the allegations in his Amended Complaint, the proper course of action would have been to not to file the complaint. Now, P&G respectfully argues that the proper course of action is to dismiss his deficient Amended Complaint.

**B.    Marking with expired patent numbers does not create a rebuttable presumption of deceptive intent at the pleading stage**

Luka repeatedly misapplies the "rebuttable presumption" quote from *Solo Cup* to the facts and procedural posture of this case. *See Pequignot v. Solo Cup Co.*, 608 F.3d 1356, 1362-63 (Fed. Cir. 2010) ("[t]he combination of a false statement and knowledge that the statement was false creates a rebuttable presumption of intent to deceive the public, rather than irrebuttably

---

[11]   Plaintiff's argument is further flawed because P&G is not "uniquely in control" of the information regarding knowledge and intent. P&G sold the Sure Max product line on September 26, 2006, well before the patents at issue expired. Innovative, and not P&G, controlled whether or not the Sure Max product line continued to be marked with expired patents (after the patents expired). The sale left P&G with no residual control over the Sure Max product line.

proving such intent."). As an initial matter, the Federal Circuit's *Solo Cup* decision did not involve a motion to dismiss at the pleadings stage. Instead, it was an appeal of a grant of summary judgment entered after discovery. Its discussion of evidentiary presumptions is inapplicable at the pleadings stage.

Even if a presumption of intent to deceive could be drawn at the pleading stage, such a presumption is not appropriate here. Merely alleging defendant's knowledge of a patent's inevitable expiration and its mis-marking of a product is insufficient to gain the rebuttable presumption. Rather, the law requires factual allegations of the knowledge of the false marking coupled with the alleged facts of false marking. In *Solo Cup*, the Federal Circuit noted that a rebuttable presumption of intent to deceive could only be drawn where the accused had actual knowledge that the statement being made was false. *Solo Cup*, 608 F.3d at 1358. The knowledge that the Federal Circuit found sufficient in that case was actual knowledge—established by witness testimony—that the accused was marking its products with an expired patent number, not an unsupported allegation, made on information and belief that P&G knew or should have known that its patents would expire at some time.

Luka has not alleged any facts to show that P&G had actual knowledge that it was making a false statement, which is distinct from Luka's allegation that P&G had knowledge its patents would expire, or had expired. There is nothing to suggest deceitful intent from knowledge of a patent's expiration alone because the expiration of a patent is not itself illegal or even an event necessarily precipitated by any conduct or act of an individual – the expiration of a patent occurs merely via the passage of time by operation of law. Accordingly, there can be no rebuttable presumption based merely on alleged knowledge of a patent's inevitable expiration, and Luka cannot rely upon a rebuttable presumption of intent to deceive as a surrogate for satisfying Rule 9(b).

### C. *Blistex*, and its progeny, fail to analyze allegations of intent to deceive under the proper standard for cases alleging fraud

Luka's reliance upon *Simonian v. Blistex*, which has been criticized and describes a rather low standard for pleading intent under Rule 9(b), is likewise misplaced. *Simonian v. Blistex*, No. 10-cv-01201, 2010 WL 4539450 (N.D. Ill. Nov. 3, 2010) (J. St. Eve) (cited in Resp. 3, 6, 10). The *Blistex* standard has been expressly criticized by a fellow judge in this district. Judge Hart, in dismissing a false marking complaint—with prejudice—for failing to plead intent to deceive the public with particularity, noted that *Blistex* (and cases like it) should not be followed because they are contrary to the Federal Circuit pronouncement in *Exergen*. *Crayola*, No. 1:10-cv-00342, slip op. at 6 n.2. The more recent *Crayola* decision characterizes the *Blistex* standard as "inconsistent" and insufficient to support a reasonable inference of intent to deceive:

> *Blistex*, 2010 WL 4539450 at *3-4, 6, decided the day before plaintiffs brief was filed, would support plaintiff in that it holds that allegations that patents listed on a product are expired, the defendant is sophisticated, and that defendant knew or should have known the product was not covered by the expired patents is sufficient to allege the intent to deceive element of a § 292 claim. *Blistex*, however, is distinguishable because, **inconsistent with *Exergen* and district court cases cited herein**, *Blistex* apparently does not apply the same standard for pleading intent when Rule 9(b) applies. See *Blistex*, 2010 WL 4539450 at *6. In any event, this court disagrees with *Blistex* and Interdesign; instead agreeing with those cases--apparently in the majority--that would hold that the facts alleged in the present case, *Blistex*, and *Interdesign* are insufficient to support a reasonable inference of intent to deceive.

*Heathcote v. Crayola*, No. 10-cv-0342, op. p. 6 n. 2 (J. Hart) (emphasis added).

Under the *Blistex* standard, Luka seeks this Court's approval to go on a "fishing expedition" within P&G in the hopes that it will find as-of-yet-unknown evidence of intent to deceive the public. See, e.g., *In re BP Lubricants Amicus Brief* at 18 (warning against any decision that would permit a relator to engage in burdensome discovery without first pleading sufficient facts). Rule 9(b) exists to prevent exactly this type of speculative pleading that unfairly attacks and burdens a defendant. *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771 (7th Cir. 1994) ("The rule is said to serve three main purposes: (1) protecting a

defendant's reputation from harm; (2) minimizing "strike suits" and "fishing expeditions"; and (3) providing notice of the claim to the adverse party."). Luka has not met the pleading requirements of Rule 9(b), nor has it provided a reason in his response why this Court should ignore these pleading requirements. Despite Luka's protestations to the contrary, his allegations of P&G's fraudulent intent are deficient and fall short of Rule 9(b)'s stringent pleading requirements. For these reasons, the Amended Complaint should be dismissed.

## IV. 35 U.S.C. § 292 VIOLATES ARTICLE II OF CONSTITUTION

The United States has intervened in this case for the sole purpose of defending the Constitutionality of 35 U.S.C. § 292. [Dkt. No. 55]. Luka has adopted the argument of the United States. (Resp. at 2.) The United States argues the Section 292 is constitutional because of the long history of *qui tam* statutes, in general. This argument, however, has no weight in the face of the actual "Take Care" clause jurisprudence from the Supreme Court. Further, the United States argues that Section 292 is constitutional because it does not prevent the United States from brining its own suit, should it choose to do so. This argument also misses the mark because the United States fails to describe how the executive branch has any practical oversight or control over a Section 292 action.

### A. The existence of other *qui tam* statutes throughout British and American history is not a significant factor in determining whether 35 U.S.C. § 292 violates Article II of the Constitution

The United States provides a lengthy history of *qui tam* actions and argues that because *qui tam* statutes, in general, have existed for hundreds of years, then the false marking statute must therefore also be constitutional.[12] (U.S. Br. 2-6) The United States also points to the

---

[12] The Government's premise that laws enacted by the First Congress must have been thought by the Framers to be constitutional (U.S. Br. 3) is also flawed. *See, e.g.*, Note, *Should the Supreme Court Presume that Congress Acts Constitutionally? The Role of the Canon of Avoidance and Reliance on Early Legislative Practice in Constitutional Interpretation*, 116 Harv. L. Rev. 1798, 1809-12 (Apr. 2003) (explaining how the First Congress enacted a Foreign Affairs bill despite a majority of Congress finding it constitutionally suspect); *see also Marbury v. Madison*, 1 Cranch 137, 176 (1803) (holding Judiciary Act of 1789, 1 Stat. 80, which was enacted by the First Congress, unconstitutional).

Supreme Court's *Vermont Agency* decision to support its specious conclusion, (*Id.* at 3-4), despite the fact that even the United States agrees that the Supreme Court explicitly declined to rule on that argument. In reality, the United States places too much reliance on both the history of *qui tam* statutes in general and the *Vermont Agency* decision, despite explicitly declining to analyze Article II.

First, the history of *qui tam* statues is immaterial because P&G is not challenging the constitutionality of all *qui tam* statutes, but rather the lack of statutory controls in Section 292. For example, the United States cites to *Riley v. St. Luke's Episcopal Hospital*, 252 F.3d 749 (5th Cir. 2001) (see, e.g., U.S. Br. 5), in support of its argument that history suggests that *qui tam* statutes are constitutional. However, the constitutionality of the *qui tam* statute at issue in *Riley* – the False Claims Act ("FCA") – is not being challenged by P&G. In fact, the "control mechanisms" that are part of the FCA were specifically cited by the *Riley* court as the reason why that statute is constitutional. *Riley*, 252 F.3d at 753. In stark contrast to the FCA, Section 292 is entirely devoid of the procedural safeguards in the FCA that operate to effectuate the obligations on the executive branch. Specifically, the FCA requires that (1) the complaint be filed under seal and served, together with written disclosure of substantially all material evidence and information the plaintiff possesses, upon the United States; (2) the United States must be given a minimum of 60 days – plus potential extensions of time – to determine whether it wishes to intervene; and (3) the United States then has a right of refusal under which it may take over the case or decline to do so, after which – if it intervenes – it may limit the role of the original plaintiff. See 31 U.S.C. § 3730(b-c). None of these mechanisms are found in Section 292, a defect the United States has not addressed.

Furthermore, a cursory review of other historical *qui tam* statutes shows the United States incorrect logic in placing emphasis on the existence of *qui tam* statutes when determining whether a specific *qui tam* statute can withstand an Article II challenge. For example, one such *qui tam* statute provided that an individual could prosecute on the government's behalf employment of other than a "free white person" in the postal service. Act of May 3, 1802,

12

ch. 48, § 4, 2 Stat. 189, 191. Without hesitation, any court today would invalidate such a statute based on the same Fifth Amendment due process clause in force at the time Congress enacted the statute. The historical presence of this statute surely does not mean that all *qui tam* statues are constitutional. As another example, an early *qui tam* statute allowed a relator to conduct a prosecution, and receive half of the fine, for criminal larceny or receipt of stolen goods. Act of Apr. 30, 1790, ch. 9, §§ 16, 17, 1 Stat. 116. With no notice or control mechanisms, this delegation of prosecutorial power to any comers would run afoul of the Article II requirements set forth in Morrison. In short, the most that can be said of the history of *qui tam* actions is that, like any statute, each must be analyzed, not grouped together in an abstract and generalized category of constitutionally permissible and constitutionally impermissible types of statutes. Therefore, the fact that other *qui tam* statutes have historically been free from constitutional issues does not end the determination of whether Section 292 is constitutional.

Second, as admitted by the United States (U.S. Br. 3), the Supreme Court in *Vermont Agency* explicitly decided not to evaluate whether any *qui tam* action, including the FCA and Section 292, violates Article II. Instead, the Supreme Court explicated stated that it "express[ed] no view on the question of whether *qui tam* suits violate Article II, in particular the Appointments Clause of § 2 and the 'Take Care' clause of § 3." *Vt. Agency of Natural Res. v. U.S.*, 529 U.S. 765, 778 n. 8 (2000). Simply put, the *Vermont Agency* case is not determinative on the Article II issue raised by P&G, and the specific facts in this case must be analyzed to determine whether the Plaintiff can properly maintain the present action in compliance with Article II.

Finally, although the United States cites a series of district court cases in which various courts have denied motions challenging the constitutionality of Section 292 under Article II (U.S. Br. 5), as of the date of this brief no appellate court has reached this specific issue with respect to Section 292.[13]

---

[13]   Although the United State cites *Pequinot v. Solo Cup Co.*, 608 F. Supp. 2d 714 (E.D. Va. 2009) as being affirmed by the Federal Circuit, that is not entirely correct. The issue of the

**B.** **Section 292 violates the "Take Care" clause of Article II because it gives a private party executive power without sufficient control by the executive branch.**

Section 292 contains absolutely no consent requirement for settlement, and there is no extensive power to control *qui tam* litigation under Section 292. Because the United States is the real party-in-interest in Section 292 cases, this utter lack of control over Section 292 claims violates Article II's mandate that the executive branch maintain "sufficient control."

**1.** **Section 292 does not give the executive branch "Sufficient Control" over a private citizen's suit brought on behalf of the United States' interests.**

P&G does not assert, as the United States suggests, that Article II requires only the executive branch to enforce the law. (U.S. Br. 6.) P&G's argument is that the executive branch is required under Article II to retain "sufficient control" in order to "ensure that the President is able to perform his constitutionally assigned duties." *Morrison v. Olsen*, 487 U.S. 654, 696 (1988) (upholding constitutionality of independent prosecutor statute because it gave the executive branch "sufficient control over the independent counsel to ensure that the President is able to perform his constitutionally assigned duties"); see also *Printz v. United States*, 521 U.S. 898, 922 (1997) (striking provisions of the Brady Act that "effectively transfers this responsibility [to take care that the laws be faithfully executed] to thousands of [state officers] without meaningful Presidential control"); *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787 (10th Cir. 2002) (United States retains "sufficient control" under False Claims Act to satisfy Article II); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 753 (5th Cir. 2001) ("the Executive retains significant control over litigation pursued under the FCA by a *qui tam* relator"); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1041

---

constitutionality of Section 292 under Article II has not been decided by the Federal Circuit in *Pequignot* or any other Federal Circuit case. For example, the Federal Circuit has specifically indicated that the issue has not yet been decided in its recent decision in *Stauffer v. Brooks Bros.*, 619 F.3d 1321, 1327 (Fed. Cir. 2010) (". . . the district court did not decide, and the parties did not appeal, the constitutionality of section 292. Thus, we will not decide [Section 292's] constitutionality without the issue having been raised or argued by the parties.")

(6th Cir. 1994) (under FCA "the Executive Branch retains 'sufficient control' over the relator's conduct to insure that the President is able to perform his constitutionally assigned duties"); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 758 (1993) (holding that executive branch retains "sufficient control" over relators under False Claims Act).

The United States claims that the Plaintiff, like a plaintiff in a FCA case, has standing as a *qui tam* partial assignee of the United States' interests. Therefore, an analysis of the application of Article II to the False Claims Act is instructive. The False Claims Act has been held to pass Article II muster by several appellate courts because of the multiple safeguards that permit the United States to control the litigation. The safeguards in the FCA that courts have deemed vital to its validity under Article II are: (1) an FCA action must be brought "in the name of the Government," with notice of the complaint and supporting evidence served on the United States before the relator is permitted to serve the complaint on the defendant; (2) the United States has the power to intervene in any FCA action and control its prosecution; (3) the United States can seek to limit the relator's participation; (4) the U.S. can seek dismissal of a relator's suit "notwithstanding the objections of the [relator]", while the relator cannot dismiss the action without the Attorney General's written consent; (5) the United States can seek to stay the relator's discovery; (6) the United States can seek alternative remedies, "notwithstanding the objections of the [relator]"; and (7) the United States retains the right to be served with all papers, to limit discovery, and to limit recovery even if it chooses not to intervene. 31 U.S.C. §§ 3729-3733; *United States ex rel. Stone v. Rockwell Int'l Corp.*, 265 F.3d 1157, 1175-76 (10th Cir. 2001); *Riley*, 252 F.3d 749 ("[a]ny intrusion by the [FCA] *qui tam* relator in the executive's Article II power is comparatively modest, especially given the control mechanisms inherent in the FCA to mitigate such an intrusion"); *Taxpayers Against Fraud*, 41 F.3d at 1041; *Kelly*, 9 F.3d at 743 ("the FCA gives the Attorney General sufficient means of controlling or supervising relators to satisfy separation of powers concerns").

As discussed in Defendant's opening brief, these safeguards (or any safeguards) are entirely lacking from Section 292.[14]  Despite the United States' assertions to the contrary (U.S. Br. 12-14), Section 292 provides no opportunity for executive branch oversight or control.  The Supreme Court has held that Article II requires that the executive branch be given "sufficient control" over executive branch powers exercised by another.  *U.S. v. Nixon*, 418 US 683, 711- 12 (1974).  The application of this standard to Section 292 is made easy by the complete absence of any control retained in the executive branch over a private citizen's suit under Section 292.  The executive branch is thus effectively precluded from its duty to "Take Care" that the laws be faithfully executed.

As the United States admits, where a plaintiff sues as the partial assignee of the United States' injury, any resulting judgment "may have preclusive effect in a subsequent suit brought by the United States."  (U.S. Br. 10.)  This is true regardless of the skill or diligence of the plaintiff.  There is no statutory mechanism under Section 292 to ensure that the public interest is actually being served, and nothing to stop the plaintiff from undercutting the public interest for his/her own via settlement or otherwise (in contrast to the FCA, which gives the United States the right to control the litigation).  If a plaintiff sues pursuant to Section 292 based on the United States' sovereign injury, and then settles for a tiny fraction of what could be recovered (which plaintiff can do under Section 292 with no permission or agreement from the United States), the United States is estopped from later bringing suit itself to recover the full amount of damages to which it (and the public) is entitled.

Further, under the United States' interpretation of Section 292, any person may freely institute suit based on a sovereign injury to the United States, even if the executive branch does not believe that such an action is warranted.  Where a plaintiff has no personal injury-in-fact and

---

[14]   It is interesting to note that the False Claims Act provisions addressing actions by private persons is several paragraphs long and contains explicit recitations of governmental controls, whereas the § 292 provision addressing who may bring an action thereunder is only a single sentence long and includes no governmental controls.

is suing only for the United States' sovereign injury (as here), the lack of any safeguards in Section 292 ensuring sufficient executive control over the plaintiff leaves the fate of the action for the United States' injury entirely in the hands of the plaintiff. Compounding this problem is the lack of notice to inform the United States Attorney General than an individual has brought suit in the name of the United States based on the sovereign injury to the United States.

In short, the lack of safeguards in Section 292, as contrasted with the many found in the FCA, show that a plaintiff with no personal injury-in-fact cannot proceed as a "partial assignee of the government's injury" without a violation of Article II.

2.     **The United States' decision not to substantively intervene fails to save Section 292 from being unconstitutional as applied to the facts of this case.**

The United States argues that Section 292 cannot be found unconstitutional in this case because the United States is not seeking to substantively intervene. (U.S. Br. 13.) This argument ignores the purpose of the Article II requirements; and it runs counter to the appellate court decisions which have held that the lack of United States intervention in cases brought under statutes, such as the False Claims Act, increases, rather than decreases, the risk of an Article II violation.

Article II prohibits Congress from granting powers belonging to the executive branch to another branch or a private party without leaving the Executive Branch sufficient control to take care that the laws be faithfully executed. If Section 292 implicitly assigned to private citizens the United States' injury from violations of the false marking statute, the constitutional infirmity lies in the United States' grant of executive power to private citizens with no executive oversight. This is true regardless of whether or not the United States seeks to intervene because, when the alleged injury is to the United States, a *qui tam* relator represents the United States' interest, even if the United States chooses not to intervene.

In fact, the absence of intervention by the United States creates a greater risk of an Article II violation than a case where the United States has intervened and directs the litigation,

as the suit proceeds with no input from the executive branch. Courts addressing the validity of the False Claims Act under Article II, for example, have been careful to circumscribe their rulings on that statute to pass constitutional muster only where the United States actually does intervene. *See, e.g., United States ex rel. Stone v. Rockwell Int'l Corp.*, 265 F.3d 1157, 1175-76, 1176 n.6 (10th Cir. 2001) ("We express no opinion regarding whether the FCA's *qui tam* provisions violate the separation of powers or the Take Care Clause in circumstances other than those presented in this case . . . . Accordingly, we agree with the Fifth, Sixth, and Ninth Circuits, and hold that at least where the United States intervenes, the *qui tam* provisions of the FCA do not violate the separation of powers by transgression of the Take Care Clause."); *Riley*, 252 F.3d at 753.

The United States' suggestion that the courts would probably decide to allow the United States to intervene if it so desired only serves to highlight Section 292's Article II problems: requiring the courts to decide whether the United States has the ability to intervene simply shifts executive power to the Judicial Branch. The United States also appears to misunderstand the issue raised by P&G when it argues that because a *qui tam* relator does not proceed as the United States or its agent, there can be no Article II issues. This argument is proper in the context of an Appointments Clause[15] analysis, but has no place here. P&G has made clear its position that Section 292 violates the Take Care clause of Article II because Congress took constitutionally-designated executive powers away from the executive branch and gave them to private citizens, without giving the executive branch sufficient control over the citizens' suits.

In summary, the United States has failed to articulate any basis for its ability to sufficiently control a relator, let alone any basis for how the United States would have any knowledge that third parties are even instituting a Section 292 suit in its name.

---

[15] The Appointments Clause is another grant of power to the Executive Branch found in Article II, but has not been raised by P&G in this case yet.

**V.      CONCLUSION**

Proctor and Gamble sold the Sure Max product line and thus had no control over how the product was marked after such sale.  As such, its motion for summary judgment should be granted.  Even if this Court declines to grant summary judgment, Luka's Amended Complaint should be dismissed because it does not satisfy the heighted pleading requirement of Rule 9(b).  Finally, P&G respectfully argues that 35 U.S.C. § 292 is unconstitutional because it violated Article II.  For each of these reasons, Luka's complaint should be dismissed.

Dated:  February 17, 2011                           Respectfully submitted,

                                                    /s/ Jason C. White
                                                    Jason C. White
                                                    Thomas M. Williams
                                                    Scott D. Sherwin
                                                    HOWREY LLP
                                                    321 North Clark Street, Suite 3400
                                                    Chicago, Illinois 60654
                                                    Tel.:  312.595.1239
                                                    Fax:  312.595.2250
                                                    E-mail:  whitej@howrey.com
                                                    E-mail:  williamst@howrey.com
                                                    E-mail:  sherwins@howrey.com
                                                    *Attorneys for Proctor and Gamble Company.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing document was served via CM/ECF on February 17, 2011, upon all counsel of record.

/s/ Jason C. White