# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| PAUL LUKA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 10 C 2511 |
| | ) |
| THE PROCTER AND GAMBLE CO., | ) |
| INNOVATIVE BRANDS, LLC, IDELLE | ) |
| LABS, LTD., and HELEN OF TROY, LTD., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Paul Luka has sued Procter and Gamble Co. (P&G), Innovative Brands, LLC (Innovative), Idelle Labs, Ltd. (Idelle), and Helen of Troy, Ltd. pursuant to the patent false marking statute, 35 U.S.C. § 292. He alleges that the defendants caused a product called Sure Max antiperspirant to be marked with the numbers of two expired U.S. patents. Each of the defendants has moved to dismiss Luka's claims for failure to state a claim and on the ground that section 292 contravenes the "Take Care" clause of Article II of the Constitution. For the reasons stated below, the Court dismisses Luka's claims against P&G, Idelle, and Helen of Troy for failure to state a claim but denies Innovative's motion to dismiss.

### Facts

Luka's claims concern two expired U.S. patents, specifically, patent numbers 5,000,356 and 5,156,834. The '356 patent covers technology for a dispenser to release

a discrete amount of an antiperspirant product with each turn on a knob at the base of the dispenser. Luka alleges that the '356 patent was issued on March 19, 1991 and expired on October 11, 2008. Am. Compl. ¶¶ 4, 17 & 21. The '834 patent covers a composition of an antiperspirant product that allows it to be dispensed as a paste or cream. Luka alleges that it was issued on October 20, 1992 and expired on October 20, 2009. *Id.* ¶¶ 5, 22 & 26.

P&G was the original assignee of both patents. *See* Compl., Exs. A & B. In his amended complaint, Luka alleges that P&G sold or licensed the Sure Max product to Innovative in September 2006 and that Innovative sold or licensed the product to Helen of Troy in March 2010. Am. Compl. ¶¶ 29-30. He alleges on information and belief that P&G continued to "exert[ ] significant control over the manufacture, marketing and sale of the Sure Max product" even after selling or licensing it, evidenced by the fact that logos and trademarks that P&G owned or controlled appeared on the product as late as April 2010. *Id.* ¶¶ 31-32.

Luka alleges that the defendants and their agents marked the packaging of Sure Max antiperspirant with the '356 and '834 patents even after their expiration. *Id.* ¶¶ 35-36. He alleges on information and belief that they did so "in order to deceive the public and gain a competitive advantage in the market." *Id.* ¶¶ 33-34. Luka also alleges that due to the defendants' marking of the product with the patents, "those who view the marking are likely to believe that the [patents] afford[ ] patent protection to the Sure Max product." *Id.* ¶¶ 39 & 42.

Luka alleges on information and belief that each of the defendants "is a

sophisticated company that has experience in applying for and prosecuting patents," has an in-house legal department, and has retained outside counsel to deal with patent and other intellectual property matters. *Id.* ¶¶ 45-48. He further alleges that the patents and their expiration dates were considered in connection with the licensing transactions and that each of the defendants knew or should have known of the patents' expiration dates. *Id.* ¶¶ 49-51, 54-57, 59-60, 63-64.

Luka alleges that Idelle is the parent of Innovative and Helen of Troy. *Id.* ¶¶ 13-14.[1] He alleges, on information and belief, that Idelle "was involved in and exerted significant control over" both of those entities' decisions to purchase the rights to the Sure Max product and/or the relevant licenses and was aware of the patents' expiration dates. *Id.* ¶¶ 52-53, 61-62, 65-66.

With his response to the defendants' motions to dismiss, Luka provided a copy of a patent and technology license agreement between P&G and Innovative that he obtained via discovery. *See* Pl.'s Resp. to Defs.' Mots. to Dismiss, Ex. B.[2] In the agreement, dated September 25, 2006, P&G granted Innovative a perpetual, non-exclusive license under the '356 and '834 patents (among others) to make, use, import,

---

[1] Luka seems to suggest in his response to the motion to dismiss that Idelle and Helen of Troy acquired Innovative. *See* Pl.'s Resp. to Defs.' Mots. to Dismiss at 11. This is contrary to the allegations in his amended complaint, in which he did not hint that Helen of Troy or Idelle acquired Innovative but rather alleged that Helen of Troy acquired the license from Innovative and that Idelle is the parent or affiliate of both Innovative and Helen of Troy. The Court does not know which is correct. It simply deals with the amended complaint as Luka drafted it.

[2] Though the license agreement is not attached to Luka's amended complaint, he argued in his response to the motions to dismiss that the Court should take it into account in considering the motions to dismiss, and defendants have interposed no objection to this.

distribute, market, offer for sale, and sell certain licensed products, specifically, antiperspirants sold under the Sure brand. *Id.* ¶¶ 1.5, 1.7, 2.1 & Sched. 1.7. The agreement provided that the license would continue "until the expiration of the last expired patent of the Licensor Patent Rights." *Id.* ¶ 3.1. It listed the expiration dates of the '356 and '834 patents as March 19, 2008 and October 20, 2009 respectively. *Id.* Sched. 1.7.[3] The "last expired patent" under section 3.1 was listed in the agreement as expiring in October 2016, several years after the expiration of the '356 and '834 patents.

In the agreement, Innovative agreed that it and its contract manufacturers would "comply with all applicable laws and regulations, including consumer protection and safety legislation, in importation of materials, manufacture, marketing and distribution of the Licensed Products." *Id.* ¶ 5.3. The agreement also contained the following provision concerning patent marking:

> **5.4 Product Marking.** Consistent with Licensor's practice immediately prior to the date hereof, Licensee shall place in a conspicuous location, on any product made or sold under the Licensor Patent Rights, a patent notice in accordance with the applicable patent marking laws of the country in which the product is made and/or sold and indicate that these patents are under license from The Procter & Gamble Company, should such markings serve as legal notice to would-be infringers.

*Id.* ¶ 5.4.

## Discussion

The patent false marking statute provides as follows:

---

[3] The expiration date for the '356 patent listed in the license agreement is several months earlier than the date Luka alleged in his amended complaint. The difference is immaterial for present purposes.

4

> § 292. False marking
>
> (a) Whoever, without the consent of the patentee, marks upon, or affixes to, or uses in advertising in connection with anything made, used, offered for sale, or sold by such person within the United States, or imported by the person into the United States, the name or any imitation of the name of the patentee, the patent number, or the words "patent," "patentee," or the like, with the intent of counterfeiting or imitating the mark of the patentee, or of deceiving the public and inducing them to believe that the thing was made, offered for sale, sold, or imported into the United States by or with the consent of the patentee; or
>
> Whoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word "patent" or any word or number importing that the same is patented for the purpose of deceiving the public; or
>
> Whoever marks upon, or affixes to, or uses in advertising in connection with any article, the words "patent applied for," "patent pending," or any word importing that an application for patent has been made, when no application for patent has been made, or if made, is not pending, for the purpose of deceiving the public–
>
> Shall be fined not more than $500 for every such offense.
>
> (b) Any person may sue for the penalty, in which event one-half shall go to the person suing and the other to the use of the United States.

35 U.S.C. § 292.

Each defendant argues that Luka has failed to allege sufficiently its involvement in false marking violative of section 292. Each also argues that section 292 is unconstitutional. The government has intervened and has filed a brief defending the constitutionality of section 292.

**1.      Sufficiency of Luka's allegations**

An article covered by an expired patent is "unpatented" within the meaning of section 292(a). *Pequignot v. Solo Cup Co.*, 608 F.3d 1356, 1361 (Fed. Cir. 2010). The false marking statute, however, does not impose strict liability. *Clontech Labs v.*

5

*Invitrogen, Inc.*, 406 F.3d 1347, 1352 (Fed. Cir. 2005). To prevail on a false marking claim under the particular part of section 292 involved in this case, a plaintiff must prove by a preponderance of the evidence that the defendant falsely marked as patented an unpatented article and that the defendant "did not have a reasonable belief that the article[ ] [was] properly marked (i.e., covered by a patent)." *Id.* at 1353. "The question of whether conduct rises to the level of statutory deception is a question of fact . . . ." *Id.*

The Federal Circuit has held that "the *fact* of misrepresentation coupled with proof that the party making it had knowledge of its falsity is enough to warrant drawing the inference that there was a fraudulent intent." *Id.* at 1352 (emphasis in original; internal quotation marks omitted). To put it another way, "the combination of a false statement and knowledge that the statement was false creates a rebuttable presumption of intent to deceive the public." *Pequignot*, 608 F.3d at 1362-63.

Just two weeks ago, the Federal Circuit ruled that claims under the false marking statute are subject to the particularized pleading requirements of Federal Rule of Civil Procedure 9(b). *In re BP Lubricants USA Inc.*, --- F.3d ---, 2011 WL 873147, at *2 (Fed. Cir. Mar. 15, 2011). Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Though Rule 9(b) allows a pleader to allege knowledge and intent generally and to plead upon information and belief, he must "'allege sufficient underlying facts from

6

which a court may reasonably infer that [the defendant] acted with the requisite state of mind.'" *BP Lubricants USA*, 2011 WL 873147, at *3 (quoting *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 (Fed. Cir. 2009)). In *BP Lubricants USA*, the court held that a "bare assertion" that the defendant is a sophisticated company with experience applying for, obtaining, and litigating patents is insufficient to meet this requirement. *Id.* at *4. It likewise rejected the proposition that "a false marking inherently shows scienter." *Id.* Finally, the court stated that pleading the facts "necessary to activate the *Pequignot* presumption is simply a factor in determining whether Rule 9(b) is satisfied; it does not, standing alone, satisfy Rule 9(b)'s particularity requirement." *Id.* at *4.

### a. P&G

Applying these standards, the Court concludes that Luka has failed to state a claim against P&G. Luka's general allegation that P&G maintained control over the marking of patents on the products after licensing them is insufficient, particularly in view of the terms of the licensing agreement. That agreement specifically required P&G's licensee Innovative to mark the licensed products with a patent notice "in accordance with . . . applicable patent marking laws." This indicates exactly the opposite of what Luka alleges; it imposes upon Innovative, not P&G, the obligation to comply with patent marking laws.

### b. Innovative

By contrast, Luka's amended complaint, as supplemented by the licensing agreement between P&G and Innovative, is sufficient to state a claim against

Innovative. The licensing agreement reflects that Innovative knowingly took on an affirmative obligation to comply with patent marking law, via a written agreement that specifically disclosed the expiration dates of the pertinent patents. This is sufficient to comply with the requirement that a false marking complaint "provide some objective indication to reasonably infer that the defendant was aware that the patent expired." *BP Lubricants USA Inc.*, 2011 WL 873147, at *3.

The Court rejects the contention that the absence of allegations identifying the particular personnel with Innovative responsible for the alleged false marking is fatal to Luka's claim. The Federal Circuit ruled in *BP Lubricants USA* that "the naming of specific individuals [who knew the patent expired] is not the only way to set forth facts upon which intent to deceive can be reasonably inferred." *Id.* at *4. More generally, imposition of a requirement that a plaintiff identify in his complaint particular individuals responsible for false marking effectively would make it impossible to plead a violation of section 292, except perhaps in a case involving an internal whistleblower. Nothing in the statute or in the Federal Circuit's cases concerning section 292, including *BP Lubricants*, suggests that the court intended to impose pleading requirements that would largely write the statute out of existence.

  c. **Helen of Troy and Idelle**

Luka has failed to state a claim against Helen of Troy. His allegations regarding Helen of Troy do not go beyond the sort of generalized allegations that the Federal Circuit held insufficient in *BP Lubricants USA*.

Similarly, Luka has made only generalized allegations regarding Idelle's

involvement and state of mind of the sort that the court held insufficient in *BP Lubricants USA*. And the fact that Idelle may be the parent of Innovative, against which Luka has stated a claim, is insufficient without more to give rise to a viable false marking claim against Idelle. A parent company is not liable for the acts of its subsidiary, absent a basis to pierce the corporate veil or, perhaps more generally, where the parent controlled the subsidiary's operations. *See, e.g., Dow Jones & Co. v. Ablaise Ltd.*, 606 F.3d 1338, 1349 (Fed. Cir. 2010); *A. Stucki Co. v. Worthington Indus., Inc.*, 849 F.2d 593, 596 (Fed. Cir. 1988)*.* No such allegations are made, plausibly or otherwise, in Luka's amended complaint.

**2.     Constitutionality of section 292**

Defendants also argue that section 292 violates the constitutional doctrine of separation of powers. "[T]he separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." *Clinton v. Jones*, 520 U.S. 681, 701 (1997) (internal quotation marks omitted).

Section 292, however, does not involve "an attempt by Congress to increase its own powers at the expense of the Executive Branch." *Morrison v. Olson*, 487 U.S. 654, 694 (1988). Nor is there any viable contention that the false marking statute "work[s] any *judicial* usurpation of properly executive functions." *Id.* at 695 (emphasis in original).

Defendants contend, however, that section 292 runs afoul of Article II, section 3 of the Constitution, which provides that the President "shall take Care that the Laws be faithfully executed." Specifically, they argue that the statute improperly invests in

9

private litigants like Luka the executive branch's duty to enforce the law.

The Take Care Clause "does not require Congress to prescribe litigation by the Executive as the exclusive means of enforcing federal law." *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 753 (5th Cir. 2001) (en banc) (False Claims Act case). It is commonplace for federal statutes, even criminal statutes, to contain civil enforcement mechanisms that permit private parties to sue to enforce statutory prohibitions. To be sure, most such statutes permit civil suits only by private parties who themselves have suffered some form of injury from the violation. But that is not constitutionally required. The Supreme Court has made it clear that Congress may authorize a private party to sue as a *qui tam* relator on the theory that the private party is, in effect, a partial assignee of the government's claim against the violator of the statute and thus has standing to sue as required by Article III of the Constitution. *See Vermont Agency of National Resources v. United States ex rel. Stevens*, 529 U.S. 765, 773-74 (2000). Section 292 involves just such an assignment. This is clear from the statute's requirement that one half of any penalty recovered by a *qui tam* relator goes to the United States and the other half to the relator. 35 U.S.C. § 292(b).

Defendants cite *Morrison* for the proposition that the Take Care Clause bars assignment of the executive's authority to enforce the law to someone outside the Executive Branch, unless the executive retains control over the litigation. This feature, defendants argue, does not exist in suits under the false marking statute. *Morrison*, however, does not preclude delegation of executive authority. Indeed, the Court in that case upheld against an Article II challenge a statute that authorized the appointment of

an independent counsel, not subject to supervision by the Attorney General, to investigate and prosecute crimes by certain high-ranking Executive Branch officials.

The fact that a federal statute like the one at issue here does not give the executive control over the conduct of litigation likewise does not render the statute constitutionally deficient. In *Morrison*, the Court upheld the independent counsel law against a separation-of-powers challenge despite the fact that the law provided that a court, not the executive, would appoint the special prosecutor; did not give the Attorney General the authority to determine the counsel's jurisdiction; and limited the Attorney General's power to remove the counsel. *Morrison*, 487 U.S. at 695-96.

That said, the Court in *Morrison* considered it significant that the law did not permit the appointment of an independent counsel without a request by the Attorney General and provided for limited removal authority. These provisions and others, the Court concluded, gave the executive "sufficient control over the independent counsel to ensure that the President is able to perform his constitutionally assigned duties." *Id.* at 696. Defendants cite the absence of such provisions in the false marking statute in arguing that the statute is unconstitutional.

There are, however, critical differences between the functions exercised by the independent counsel under the statute considered in *Morrison* and by civil relators under *qui tam* statutes like the one at issue in this case. As the government points out in its brief, and as the Fifth Circuit noted in *Riley*, a *qui tam* relator is not acting as the government itself, unlike the independent counsel considered in *Morrison*. *Riley*, 252 F.3d at 755. In addition, "in contrast to independent counsel who undertake functions

relevant to a criminal prosecution, relators are simply civil litigants." *Id.* In short, a relator suing in a civil capacity wields a far lesser degree of the power of the executive than a prosecutor considering whether to bring charges and who prosecutes charges in the name of the government. *Id.* at 756.

This Court agrees with *Riley* that in light of these distinctions between the type of litigation at issue in *Morrison* and that involved in a *qui tam* action under the false marking statute, "the Executive must wield two different types of control in order to ensure that its constitutional duties under Article II are not impinged." *Id.* Though the considerations discussed in *Morrison* apply, they do not apply in the same way to a statute permitting civil litigation by someone outside the Executive Branch as they do to a statute permitting a criminal prosecution by someone outside that branch.

With these considerations in mind, the Court proceeds to consider whether the false marking statute's delegation to private litigants of the authority to institute actions is permitted under the Take Care Clause. The Court is persuaded by the government's argument that the statute survives constitutional scrutiny.

*Qui tam* statutes have existed since the establishment of our republic. *See Marvin v. Trout*, 199 U.S. 212, 225 (1905). The first Congress adopted several *qui tam* statutes, some of which, like section 292, authorized a private person to file suit on behalf of the government and provided that recovery was to be divided between the government and the relator. *See Vermont Agency*, 529 U.S. at 777 n.6. "[A] contemporaneous legislative exposition of the Constitution when the founders of our Government and framers of our Constitution were actively participating in public affairs

acquiesced in for a long term of years, fixes the construction to be given its provisions."
*Myers v. United States*, 272 U.S. 52, 175 (1926).

Every circuit to consider Article II challenges to the False Claims Act (FCA), another *qui tam* statute, has upheld the statute. *See Ridenour v. Kaiser-Hill Co.*, 397 F.3d 925, 934-35 (10th Cir.2005); *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 807 (10th Cir. 2002); *Riley*, 252 F.3d at 752; *United States ex rel. Taxpayers Against Fraud v. General Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993). Though there are nuanced differences among the rationales of certain of these decisions, each of the courts concluded that allowing a private *qui tam* relator to sue on the government's behalf did not run afoul of Article II.

There are, to be sure, differences between the FCA and the false marking statute. Specifically, the FCA contains within its four corners provisions that enable the executive to exercise some degree of control over the initiation and termination of litigation brought by a *qui tam* relator. Among other things, as the Fifth Circuit noted in *Riley*, the FCA gives the government the authority to intervene and, if it wishes, to take over the conduct of a suit under the Act, and it likewise gives the government the authority to terminate a suit notwithstanding the relator's objection. *See Riley*, 252 F.3d at 753. The FCA also contains other mechanisms giving the government a degree of oversight or control over a relator's Act *qui tam* suit. *See id.* at 754.

Such provisions are absent from section 292.[4] But that does not leave the

---

[4] The Court notes, however, that as the government points out, the original
(continued...)

13

government without the ability to exercise control over the conduct of a *qui tam* suit for false patent marking. Under the law, the government must be notified of any patent suit within one month of the suit's commencement. *See* 35 U.S.C. § 290. The Rules of Civil Procedure give the government the ability to request intervention in a false marking case. Fed. R. Civ. P. 24. If the government chooses to intervene, the relator cannot drop the case without the government's consent. *See* Fed. R. Civ. P. 41(a)(1)(A)(ii). And if the government, having received notice, chooses not to intervene (as is frequently the case in False Claims Act *qui tam* suits), one may fairly infer that the executive itself sees no need to do so and thus perceives no impingement on the exercise of its law enforcement authority.

For these reasons, the Court agrees with the district court in the *Pequignot* case that "[a]though these mechanisms concededly do not rise to the same level of government control provided by the FCA, the FCA's strict safeguards are not required because . . . § 292(b) represents a minimal intrusion onto Executive Branch power." *Pequignot v. Solo Cup Co.*, 640 F. Supp. 2d 714, 728 (E.D. Va. 2009), *vacated in part on other grounds*, 608 F.3d 1356 (Fed. Cir. 2010).

In this regard, the Court respectfully disagrees with the recent decision in *Unique Product Solutions, Ltd. v. Hy-Grade Valve, Inc.*, No. 5:10-CV-1912, 2011 WL 649998 (N.D. Ohio Feb. 23, 2011), *reaff'd on reconsideration*, 2011 WL 924341 (N.D. Ohio Mar. 14, 2011). The court in that case relied on the Federal Circuit's statement in *Pequignot*

---

[4](...continued)
version of the False Claims Act, adopted in 1863, made no provision for control or intervention by the Executive in a relator's suit. *See* Govt. Brief at 3 (citing Act of March 2, 1863, ch. 67 § 6, 12 Stat. 698).

14

that the false marking statute is a criminal statute to conclude that the analysis in *Morrison* applied. Specifically, the court stated that "as the False Marking Statute is criminal, the Court is bound by *Morrison* and its 'sufficient control' analysis, which provides the necessary precedent for examining a statute delegating the authority to prosecute a criminal action." *Id.*, 2011 WL 649998, at *4. In this Court's view, the fact that section 292 is a criminal statute does not make a *qui tam* suit under section 292(b) "a criminal action." Indeed, if it was, the Rules of Civil Procedure would not even apply – including Rule 9(b), which the Federal Circuit specifically held in *BP Lubricants USA* applies in false marking cases. *See BP Lubricants USA*, 2011 WL 873147, at *2. In this Court's view, the better view of the false marking statute is that it is a criminal statute with a parallel civil enforcement mechanism. A *qui tam* suit under section 292(b) is a civil action, not a criminal action.[5] That is why the Rules of Civil Procedure apply to false marking suits, and that is why such suits are not properly considered "criminal actions" the pursuit of which cannot properly be delegated to a private litigant due to the absence of control mechanisms of the sort the Supreme Court considered in *Morrison*.

In its decision denying reconsideration, the court in *Unique Product Solutions* said that its analysis did not depend on whether the false marking case is a criminal case or a civil case. *Unique Product Solutions*, 2011 WL 924341, at *3. It relied on the fact that the Sixth Circuit had applied the *Morrison* analysis to the False Claims Act and

---

[5] If a false marking case were truly a "criminal action," as the court in *Unique Product Solutions* stated, the burden of proof would not be the preponderance-of-the-evidence standard that the Federal Circuit has held applies.

15

that the Federal Circuit had not yet ruled otherwise. *Id.* (citing *United States ex rel. Taxpayers Against Fraud*, *supra*). The fact is, however, that although the Sixth Circuit cited *Morrison*, it did not require the same degree of control that the Supreme Court deemed sufficient in *Morrison*. *See Taxpayers Against Fraud*, 41 F.3d at 1041.

For these reasons, the Court rejects defendants' Article II challenge to section 292.

## Conclusion

For the reasons stated above, the Court grants the motions to dismiss by defendants Procter and Gamble Co. [# 28] and Idelle Labs, Ltd. and Helen of Troy, Ltd. [# 45] but denies the motion to stay or dismiss filed by defendant Innovative Brands, LLC [# 40]. The Court directs Innovative Brands to answer the amended complaint by no later than April 11, 2011. Rule 26(a)(1) disclosures are to be made by April 18, 2011. The case is set for a status hearing on April 22, 2011 at 9:30 a.m. for the purpose of setting a discovery schedule. Counsel are directed to discuss and attempt to agree on an appropriate schedule to propose to the Court at the status hearing.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: March 28, 2011